523 So.2d 1199 (1988)
John Lee KINGERY, Appellant,
v.
STATE of Florida, Appellee.
No. BT-23.
District Court of Appeal of Florida, First District.
March 30, 1988.
*1200 Louis O. Frost, Jr., Public Defender, Alan Chipperfield, and James T. Miller, Asst. Public Defenders, Jacksonville, for appellant.
Robert A. Butterworth, Atty. Gen., John W. Tiedemann, and Edward C. Hill, Jr., Asst. Attys. Gen., Tallahassee, for appellee.
PER CURIAM.
Appellant John Lee Kingery seeks review of his conviction and sentence for second degree murder. The issues raised on appeal concern: (1) the admission of testimony regarding the victim's state of mind the evening before his death, (2) the ruling designating a state witness partially adverse, (3) the prosecutor's consultation with a state witness during a recess in her cross examination, (4) the jury instructions on excusable homicide and justifiable homicide, (5) the admission of a photograph of the victim and the prosecutor's use of the photograph in closing argument, (6) the denial of a motion for mistrial after a detective's comment on appellant's courtroom appearance, and (7) the imposition of a sentence exceeding the recommended guideline sentence. We reverse and remand for a new trial.
The tragic events leading up to appellant's arrest and subsequent conviction occurred in the early morning hours of November *1201 2, 1986, in the parking lot of a Jacksonville bar. On November 2, 1986, appellant was arrested and charged with the shooting death of Arthur Max Davis (Davis). Appellant admitted the shooting, but stated he acted in self defense. Initially, the state filed a two-count information charging appellant with second degree murder and use of a firearm in commission of a felony. After plea negotiations proved unsuccessful, the state sought and obtained an indictment charging appellant with first degree murder.
Some background information is helpful for an understanding of the events which form the subject of this appeal. The record reflects that appellant and Davis, both 27 years old, attended the same high school, but were not friends. Davis developed an interest in a young woman who was employed as a bartender at a local bar, but she refused his attentions. On the night of the shooting, Davis learned that the young woman was romantically involved with appellant.
The state presented four witnesses during its case-in-chief. The testimony of these four witnesses established that from 12:30 until 2:30 a.m. of November 2, 1986, appellant and Davis engaged in four confrontations. Appellant was alone during all but the second confrontation, but Davis was accompanied throughout by two friends, a male and a female. Davis was intoxicated, and was described by one witness as belligerent, obnoxious, and obscene. Conversely, witnesses described appellant as appearing nervous and intimidated, and stated that appellant repeatedly told Davis to leave him alone. The first and second confrontations were limited to oral exchanges. However, when appellant walked away from the second confrontation with Davis, he opened his truck door to get in the driver's seat, and deliberately damaged the door of Davis's truck by bumping it with the door of his own truck.
During the third confrontation, more obscenities were exchanged. In addition, Davis made inappropriate references to appellant's girl friend, and appellant responded in kind with respect to the woman accompanying Davis. At that point, the woman reached in appellant's truck window and slapped him. As Davis continued to harangue, appellant displayed a gun that had been under his truck seat, and again told Davis to leave him alone.
Between the third and fourth confrontation, Davis got in the back of his pick-up truck and removed his shirt and shoes, saying he wanted to be prepared  "in case the guy want[s] to fight." The fourth confrontation took place in front of the bar where appellant's girl friend worked. Appellant was seated in his truck in the parking lot, talking with his girl friend who stood beside the truck. Davis's truck pulled into the parking lot and came to a quick stop. Davis, clad only in blue jeans, jumped from the back of the truck and moved toward appellant, calling him obscene names. Appellant's girl friend attempted to stay between the two men, but Davis reached around her and struck appellant about the head and shoulders.
As appellant's girl friend went into the bar to call the police, Davis rushed appellant a second time. Appellant went down on the truck seat. When he came up, he shot Davis in the chest. Davis turned and caught the side of his truck. Davis's left knee touched the ground briefly, then he pulled himself back up, keeping one hand on the truck. Appellant got out of his truck, and as Davis reached toward him with his right hand, appellant shot a second time. The second shot struck Davis in the head.
The jury found appellant guilty of second degree murder. The trial court departed from the recommended 12 to 17 year sentencing range, and sentenced appellant to a 25-year term of incarceration, providing as reasons (1) the flagrant disregard for the life and safety of others, and (2) the use of excessive force.
The first issue for our consideration concerns statements purportedly made by the victim Max Davis some five hours before the shooting. These statements were introduced into evidence through the testimony of two rebuttal witnesses. These witnesses saw Davis at approximately 9:00 *1202 p.m. of the night of the shooting. Over objection, the witnesses testified that Davis was in a happy mood and said he might go to a bar to see a "girl [that] he liked or she liked him." One of the witnesses said Davis asked how he could get the girl to go out with him. The witness advised Davis to take the girl a single rose. According to both witnesses, Davis said the girl's "ex-boyfriend or some guy" might be jealous, but that he [Davis] would not fight the "guy." The witnesses stated that Davis did not appear to have been drinking when they saw him.
It is well settled that hearsay is inadmissible unless it falls within one of the exceptions to the hearsay rule. § 90.802, Fla. Stat. (1985); Correll v. State, 13 F.L.W. 34, 35 (Fla. Jan. 14, 1988). In this case, the testimony of the rebuttal witnesses was admitted on the basis of the state of mind exception provided at section 90.803(3)(a), which states:
The provision of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:
.....
(3) Then existing mental, emotional, or physical condition.
(a) A statement of the declarant's then existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
(1) Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.

(2) Prove or explain acts of subsequent conduct of the declarant. (Emphasis supplied.)
Out of court statements are admissible under the state of mind exception if (1) the statement shows the declarant's future intent to perform an act that is at issue in the case, or (2) the statement shows the declarant's state of mind when the statement was made or at any other time when that state is an issue in the case. Correll, 13 F.L.W. at 35; Wells v. State, 492 So.2d 712, 716 (Fla. 1st DCA) review denied, 501 So.2d 1283 (Fla. 1986); Morris v. State, 456 So.2d 471, 474-476 (Fla. 3d DCA 1984), rev'd, 487 So.2d 291 (Fla. 1986); Ehrhardt, Florida Evidence § 803.3a (2d Ed. 1984); Dobson, Evidence, 11 Nova L.J. 1291, 1391 (1987). This is particularly true when the purported statements to a third party were made by a homicide victim. Correll v. State, 13 F.L.W. at 35; Bailey v. State, 419 So.2d 721 (Fla. 1st DCA 1982); Fleming v. State, 457 So.2d 499 (Fla. 2d DCA 1984), petition for review denied, 467 So.2d 1000 (Fla. 1985); Hunt v. State, 429 So.2d 811 (Fla. 2d DCA 1983); Ehrhardt, § 803.3a, pp. 476-477, f.n. 3. Indeed, a homicide victim's purported statements to a third party have been deemed admissible only in three general categories in which the need for the statements appears to overcome the possible prejudice. These categories are: (1) the defendant claims self defense, which can be rebutted by the victim's statements that he feared the defendant; (2) the defendant claims the victim committed suicide, which can be rebutted by statements of the victim that are inconsistent with suicide; and (3) the defendant claims the victim's death was accidental, which can be rebutted by the victim's statements that he feared whatever the instrument of death proved to be. However, if the evidence is highly prejudicial, it will be excluded even if it has a high degree of relevance. Kennedy v. State, 385 So.2d 1020, 1021 (Fla. 5th DCA 1980), citing United States v. Brown, 490 F.2d 758, 767 (D.C. Cir.1973); Ehrhardt, § 803.3a, at pp. 476-477, f.n. 3.
The sole issue at trial was appellant's claim that he acted in self defense. The testimony of the state's witnesses established that Davis was the aggressor. The record does not reflect, nor does the state suggest, that Davis feared appellant in any way. Although a claim of self defense will provide the vehicle for admission into evidence of otherwise inadmissible hearsay if the statement is offered to show that the victim feared the accused, the hearsay testimony in this case does not satisfy that test. While purportedly admitted *1203 to show Davis's peaceful and happy state of mind on the night of the shooting, to show that appellant was actually the aggressor, Davis's state of mind some five hours before the shooting was not at issue. Testimony of the state's own witnesses clearly established that Davis was the aggressor in each confrontation. Therefore, Davis's statements, reflecting his peaceful state of mind earlier in the evening while he was sober, were inadmissible because not relevant to any issue in the case. In effect, the state used this inadmissible rebuttal testimony in closing argument to contradict the testimony of the witnesses it presented during its case-in-chief, thereby effectively negating appellant's claim of self defense.
The second issue concerns the ruling which declared one of the state's witnesses partially adverse, and allowed the witness to be impeached by purportedly prior inconsistent statements. The first of these statements pertained to the time between the two shots. On direct examination, this witness testified that she thought the time between the two shots was four to five seconds. Over objection, after being declared an adverse witness, the witness's deposition testimony was introduced to show that formerly she estimated the time between shots as five to ten seconds.
The second statement pertained to Davis's physical condition immediately after the first shot. In response to a question on cross examination, the witness stated that at the time of the second shot, Davis was not helpless. The state was permitted to impeach the witness by reading the following paragraph from her deposition:
The shot hit him, I think, about right in here, I think, ... something like that, around the chest area. I don't know if John, you know, wasn't sure where he hit him, but you could see the blood and I've asked myself, I often ask myself, I don't know why he shot him again, the guy was going to be helpless.
Before declaring the witness partially adverse, the trial court noted that her trial testimony was generally consistent with her deposition testimony. Nevertheless, the trial court admitted the deposition statement, but denied the defense request for a limiting instruction.
Florida still adheres to the common law principle that impeachment of one's own witness is proper only in very limited circumstances. Section 90.608(2), Florida Statutes, provides in part that "[a] party calling a witness shall not be allowed to impeach his character ... [unless] the witness proves adverse." The criteria for adverseness have been long-standing. In Jackson v. State, 451 So.2d 458, 462 (Fla. 1984), the court quoted Adams v. State, 34 Fla. 185, 195-196, 15 So. 905, 908 (1894), as the seminal case on this point. In Adams, the court held:
It is very erroneous to suppose that, under this statute [§ 1101 Rev.Stat.Fla. (1892), precursor to § 90.608(2), Fla. Stat. (1979)], a party producing a witness is at liberty to impeach him whenever such witness simply fails to testify as he was expected to do, without giving any evidence that is at all prejudicial to the party producing him. The impeachment permitted by the statute is only in cases where the witness proves adverse to the party producing him. He must not only fail to give the beneficial evidence expected of him but he must become adverse by giving evidence that is prejudicial to the cause of the party producing him. When a party's witness surprises him by not only failing to testify to the facts expected of him, but by giving harmful evidence that is contrary to what was expected, then, as is the purpose of this law, he is permitted to counteract the prejudicial effect of the adverse testimony of such witness, by proving that he has made statements on other occasions that are inconsistent with his present adverse evidence. It never was the purpose of this statute to allow a party to put up a witness for the purpose of endeavoring to get from him beneficial evidence, and upon his simple failure to testify to the desired facts, to permit him to get the benefit of those expected facts, as substantive evidence through the mouth of another *1204 witness, under the guise of impeachment. Evidence adduced in this manner is nothing more than the veriest hearsay, and is inadmissible. Even where a witness is properly impeached by proof of conflicting statements made on other occasions, the conflicting statements as made to and detailed by the impeaching witness should not be considered as substantive evidence in sustenance of the party's cause who produced the impeached witness; but has weight only for the purpose of counteracting or annulling the harmful effects of the adverse testimony in the cause given by the impeached witness that is inconsistent with his statements testified to have been made on other occasions. (Emphasis supplied.)
In the event a witness's statement meets the criteria for adverseness, his prior inconsistent statements are admissible for impeachment purposes, but may not be used as substantive evidence. Jackson v. State, 451 So.2d at 463; Austin v. State, 461 So.2d 1380 at 1383 (Fla. 1st DCA 1984); Mazzara v. State, 437 So.2d 716 at 719 (Fla. 1st DCA 1983), Judge Nimmons, specially concurring. When evidence is inadmissible for one purpose, but admissible for another, the court, "upon request, is required to instruct the jury as to the limited purpose for which the evidence is received." § 90.107, Fla. Stat. (1985); Mazzara v. State, 437 So.2d at 719.
In the instant case, the witness's trial testimony was not inconsistent with her deposition testimony in any essential respect, nor do we find the testimony prejudicial to the state's case under the stringent criteria set forth in Jackson v. State and cases cited therein. After declaring the state's witness partially adverse, the trial court improperly denied defense counsel's request for a limiting instruction. The admission of the witness's deposition testimony, without an instruction to the jury as to the limited purpose for which the evidence was being received, permitted the state to use what could fairly be termed affirmatively prejudicial testimony as substantive evidence in closing argument. Since we are unable to say, beyond a reasonable doubt, that the state's subsequent use of this testimony as substantive evidence did not affect the verdict, the trial court's ruling on this point must be considered harmful. State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986). See also Pitts v. State, 333 So.2d 109 (Fla. 1st DCA 1976).
The third issue pertains to a lunch recess which occurred during defense counsel's cross examination of the state's first witness. This witness was the female friend who was with Davis on the night of the shooting. The trial court denied a defense request to instruct the prosecutor not to talk or consult with the witness during the recess. In lieu of a complete bar, the trial court permitted the state to consult with its witness in defense counsel's presence.
The actual consultation took place in the State Attorney's office. When defense counsel arrived, this witness and another state's witness were already seated in the office. Defense counsel protested to the trial court that the matters discussed by the prosecutor did not pertain to redirect examination, as contemplated by the court. Counsel argued the prosecutor's discussion related to the cross examination, and was, in effect, an attempt to calm the witness and change her combative demeanor in response to defense counsel's questions.
It is undisputed that an attorney may talk to a witness about the testimony the witness will give, and that the witness's credibility should not be challenged on the basis of the discussion. Fla.Std.Jury Instr. (Crim.) 2.05-7. It is also undisputed that a criminal defendant's right to counsel encompasses the right to consult with his attorney during any recess, even if the recess occurs in the middle of the defendant's testimony. Thompson v. State, 507 So.2d 1074, 1075 (Fla. 1987); Bova v. State, 410 So.2d 1343, 1344 (Fla. 1982).
Nevertheless, we are not prepared to say that a defendant's right to confront adverse witnesses includes the right to preclude consultation between a state's witness and the prosecutor during a recess in cross examination. In making this determination, *1205 we are cognizant that a witness's demeanor is a primary factor in an evaluation of that witness's credibility. Furthermore, we recognize that permitting the state to consult with a crucial witness during a break in rigorous cross examination affords the prosecutor an opportunity to calm a combative witness, and thus may have a chilling effect on the resumed cross examination.
Our research has disclosed no authority expressly addressing this rather novel question, nor have respective counsel directed our attention to such authority. Our reasoning on this point attempts to give due weight to the broad discretion accorded a trial court in the conduct of a trial, see § 90.612, Fla. Stat. (1985); Smith v. State, 404 So.2d 167, 169 (Fla. 1st DCA 1981), and the right of an accused to a full and fair cross examination of the state's witnesses. See Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Steinhorst v. State, 412 So.2d 332, 337 (Fla. 1982); Rivera v. State, 462 So.2d 540, 543 (Fla. 1st DCA) review denied, 469 So.2d 750 (Fla. 1985). While the trial court's ruling on this point conceivably had some impact on defense counsel's cross examination, we conclude that the ruling was consistent with "judicial discretion in controlling the mode, order, and scope of cross-examination." Smith v. State, 404 So.2d at 169.
The fourth issue concerns the trial court's instructions to the jury on excusable homicide and justifiable homicide. The jury instructions at issue are the following instructions from the Florida Standard Jury Instructions in Criminal Cases: (1) Introduction to Homicide at page 61,[1] (2) Justifiable Use of Deadly Force at pages 40-43, and (3) Excusable Homicide at page 76.[2] Defense counsel requested only the paragraph two "heat of passion" instruction on excusable homicide. Counsel also asked the court not to give the paragraph three instruction dealing with "sudden combat" and use of a weapon in combat, which appears at page 76, and also asked the court not to give the short introductory definition of excusable homicide which appears at page 61. Over objection, the trial court gave the short introduction in full, and paragraphs two and three of the instruction on excusable homicide. Appellant maintains the introduction to excusable homicide and paragraph three of the excusable homicide instruction are inherently misleading, because they suggest that a killing committed with a deadly weapon is never excusable. We agree that the instruction is misleading.
*1206 It is well settled that "[j]ury instructions must relate to issues concerning evidence received at trial (citations omitted), [and] the court should not give instructions which are confusing, contradicting, or misleading." Butler v. State, 493 So.2d 451 (Fla. 1986). Furthermore, a jury instruction must not suggest that the excusable homicide defense is unavailable if a dangerous weapon was used. Young v. State, 509 So.2d 1339 (Fla. 1st DCA 1987); Ortagus v. State, 500 So.2d 1367 (Fla. 1st DCA 1987); Clark v. State, 461 So.2d 131 (Fla. 1st DCA 1984); Bowes v. State, 500 So.2d 290 (Fla. 3d DCA 1986), review denied, 506 So.2d 1043 (Fla. 1987); Parker v. State, 495 So.2d 1204 (Fla. 3d DCA 1986) review denied, 504 So.2d 768 (Fla. 1987); Blitch v. State, 427 So.2d 785 (Fla. 2d DCA 1983).
In Young, the trial court did not give the standard jury instruction on excusable homicide. Instead, the court recited the excusable homicide statute, which provides:
Homicide is excusable when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution, and without any unlawful intent, or by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.
§ 782.03, Fla. Stat. (1985); Young, 509 So.2d at 1340-1341. Young was convicted of second degree murder in the death of his wife, who was killed by a single shotgun blast fired at close range. The defense theory was accidental death. Defense counsel in Young, as did counsel in the instant case, objected to the second part of the instruction as inapplicable. The prosecutor in Young argued that a killing is excusable only if a dangerous weapon is not used or the killing is not done in a cruel or unusual manner. During closing argument, the prosecutor repeated the assertion; and the trial court overruled the defense objection that the argument was a misstatement of the law. This court reversed, finding the Blitch rationale applicable, that is, "that the instruction might have misled the jury by inaccurately appearing to suggest that a killing can never be excusable if committed with a dangerous weapon." 509 So.2d at 1341.
The Bowes case concerns two counts of first-degree murder and one count of third-degree murder occurring during a sale or delivery of marijuana. Bowes and two co-defendants were to deliver a bale of marijuana to three men from Tennessee. Apparently everyone who arrived at the transfer site was armed; the evidence at trial was conflicting with respect to the shootout which ensued. Defense counsel requested an instruction on sudden provocation, and also asked that the court not include the final portion of the instruction relating to sudden combat, "since that was not a claimed defense and might mislead the jury." 500 So.2d 291. The prosecution asked the court to give the entire instruction, since the jury might find any part of it applicable to any of the charges. The trial court gave the instruction in its entirety, and Bowes was found guilty on all three murder counts. The Third District reversed, finding the instruction as given may have led the jury to conclude the homicides were inexcusable because they were committed with handguns.
In the instant case, over objection, the trial court instructed the jury twice on the "sudden combat" portion of the excusable homicide instruction. The first reference occurred in the introduction to homicide instructions, and the second reference was within the context of the complete excusable homicide instruction. Similarly, the trial court read, over objection, the justifiable homicide instruction. This instruction states that "[t]he killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant, or to commit a felony in any dwelling house in which the defendant was at the time of the killing." Although agreeing that the instruction did not relate to appellant's theory of defense, the trial court concluded it could not be omitted.
We find that the disputed instructions were misleading and confusing, in that *1207 they did not pertain to the evidence produced at trial. Thus, in this case, as in Butler, the misleading jury instructions "gave the state the benefit of a situation which was disavowed by its own witnesses." 493 So.2d at 452. Although the prosecutor in this case pressed vigorously for the sudden combat instruction, the instruction did not comport with the evidence presented by the state. The testimony of the state's witnesses established that the altercation which led to Davis's death was made up of a series of haranguing confrontations in which Davis was the aggressor. There was no sudden combat. Consequently, in the circumstances of this case, it was error to give the sudden combat instruction, since, "there is a reasonable possibility that the error affected the verdict." State v. DiGuilio, 491 So.2d at 1139.
The fifth issue for our review pertains to the admission of a photograph of Davis's body, and the subsequent use of that photograph in closing argument. The test for admissibility of photographic evidence is whether the photograph is "relevant to any issue required to be proven in a given case." Adams v. State, 412 So.2d 850, 853 (Fla. 1982), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982), quoting State v. Wright, 265 So.2d 361, 362 (Fla. 1972). See also Henderson v. State, 463 So.2d 196, 200 (Fla.), cert. denied, 473 U.S. 916, 105 S.Ct. 3542, 87 L.Ed.2d 665 (1985); Mazzara v. State, 437 So.2d at 718-719. The photograph at issue in this case depicts Davis's body at the scene of the shooting. Though purportedly admitted to show how Davis was dressed at the time of his death, Davis's manner of dress was not an issue in the case. We find, therefore, that the photograph was marginally relevant, if that.
The sixth issue concerns Detective Warren's comment contrasting appellant's neat courtroom appearance with his appearance at the time of his arrest. While this comment could be construed as an improper attempt to attack appellant's character, see Proctor v. State, 447 So.2d 448, 449 (Fla. 3d DCA 1984), neither the comment nor the admission of the photograph would be sufficient, without more, to warrant reversal. Since we find we must reverse on other grounds, we find it unnecessary to consider the cumulative effect of these two errors.
In summary, since we are unable to say that the errors set forth in issues one, two, and four did not affect the verdict, the errors are harmful within the contemplation of DiGuilio. Therefore, we reverse appellant's conviction and remand the case for a new trial. In light of our decision, we find it unnecessary to address the seventh issue concerning sentencing.
Accordingly, appellant's conviction is reversed and this case is remanded for a new trial.
SMITH, C.J., and WENTWORTH, J., concur.
JOANOS, J., concurs and dissents with written opinion.
JOANOS, Judge, concurring and dissenting.
I concur with the majority except in what has been labeled as the first and second issues in the majority opinion.
As to the first issue, I agree that the evidence presented through the testimony of two rebuttal witnesses as to statements purportedly made by the victim some five hours before the shooting was inadmissible hearsay. However, in the context of this case, I would not consider that error as constituting reversible error.
In addition, I dissent from the majority view as to the second issue. I disagree that it was error to declare the specified state's witness as partially adverse and allow the witness to be impeached as to the prior inconsistent statements. Under the circumstances, it was reasonable to view that testimony as affirmatively prejudicial to the State as required by Adams v. State, 34 Fla. 185, 195-196, 15 So. 905, 908 (1894) and Jackson v. State, 451 So.2d 458, 462 (Fla. 1984). The situation that existed at the time of the two shots was at the very core of the fact determinations to be made in this case. Whether the victim was helpless *1208 between the two shots was of extreme importance in the State's case. However, I would agree with the majority view that upon his request, the defendant should have been given an instruction as to the limited purpose for which the evidence was received. § 90.107, Fla. Stat. (1985).
NOTES
[1] The Introduction to homicide section of the standard jury instructions provides in relevant part:

.....
JUSTIFIABLE HOMICIDE
The killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant, or to commit a felony in any dwelling house in which the defendant was at the time of the killing.
EXCUSABLE HOMICIDE
The killing of a human being is excusable, and therefore lawful, when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent, or by accident or misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.
[2] The complete excusable homicide instruction provides:

EXCUSABLE HOMICIDE
An issue in this case is whether the killing of (victim) was excusable.
The killing of a human being is excusable if committed by accident and misfortune.
In order to find the killing was committed by accident and misfortune, you must find the defendant was:
1. a. doing a lawful act by lawful means and with usual care and
b. acting without any unlawful intent.
2. in the heat of passion brought on by a sudden provocation sufficient to produce in the mind of an ordinary person the highest degree of anger, rage or resentment that is so intense as to overcome the use of ordinary judgment, thereby rendering a normal person incapable of reflection.
3. engaged in sudden combat. However, if a dangerous weapon was used in the combat or the killing was done in a cruel or unusual manner, the killing is not excusable.
Definition: A "dangerous weapon" is any weapon that, taking into account the manner in which it is used, is likely to produce death or great bodily harm.